Good morning, Your Honors. May it please the Court, Sung Park, on behalf of the appellant, Mr. Sutcliffe. The Court has ordered the parties to specifically address two issues, one being whether the government provided sufficient proof to satisfy the jurisdictional element of Section 875C, and two, whether the government provided sufficient proof to show that Mr. Sutcliffe acted, in this case transferred information with the intent to aid and abet the false representation of Social Security numbers. First I'll address the second issue first, and that is whether Mr. Sutcliffe acted with the intent to aid and abet false representation of the Social Security numbers with intent to deceive. Now, I believe that we all know why Mr. Sutcliffe did what he did. Why? He did it to scare the people. Scare them of what? Identity theft. It was an invitation to people to steal this identity. Well, I think he was venting his anger for being terminated improperly. He was engaged in a labor dispute. He felt he was discharged improperly and unfairly. I don't think he's going to get very far in trying to justify his conduct. I mean, you know, people get angry and beat other people up. Sometimes they go and kill them. None of that is justification. I don't think he's going to get very far as to why he did it. Why don't you talk to us about whether or not the — which is the question we asked, whether there's evidence, sufficient evidence of intent. Right. The statute requires specific intent. Of intent as to the crime, not as to the sort of personal motive. Right. The statute requires specific intent to aid and abet any unlawful activity that constitutes a crime. And in this case, the government has identified false representation of Social Security numbers. And there was no evidence presenting false representation of Social Security — Which is a fancy way of saying that he put online two Social Security numbers, people's real Social Security numbers. These are not false numbers, right? Right. There are — He put the names of people and their Social Security numbers online with somebody. And then he had this explanation as to how he can use that to steal their identity. Well, actually, the article explained how to protect themselves from identity theft. But I guess you could read it to mean that it was a warning. However — One of the things is don't give out your Social Security number. Isn't that one way to protect yourself? That's correct, Your Honor. However — So when you couple it with having actually disclosed the Social Security numbers, one could reasonably — the jury could reasonably read this as the article as really meaning, here's how you go ahead and commit identity theft. However, the issue — one of the issues — I think it's silence connotes assent in this case. You can see the jury could have read that. Possibly. That's one explanation. You know, it's possibly good enough. For substantial evidence, that's pretty good. Okay. But one of the issues is, as pointed out in our briefs, is that we don't have a false representation of Social Security numbers. The act did not occur. No one attempted to commit false representation. There was no evidence of anyone having done anything remotely close to committing a false representation. Now, in order to have a specific intent to aid and abet — We don't know. Right. We don't know. We don't know. But in order to have a specific intent to aid and abet an activity such as false representation, we submit that there has to be some indication that crime would occur. Without that possibility happening, we're speculating that — You don't have to have a complete crime, right? You don't. A day does not go by when we're not bombarded with information from everybody under the sun, including the government, to protect our Social Security numbers, because if they're in the wind, we're at danger. I mean, a day doesn't go by when we're not bombarded with that. Right. So we're — It's unbelievable, the concern about those numbers flying around right now. You read everything about the whole, quote, illegal alien business. They're rounding up people right and left. They're using other people's Social Security numbers. It's a real problem. Right. However, we're dealing with a specific intent to aid and abet false representation. And what the government has argued — Speaking in ordinary language, aid and abet identity theft. False representation is that he's aiding and abetting somebody else who wishes to make a false representation that that's their credit card. Right. Is that right? And identity theft is the street name for that. That's correct. And that it was — and doesn't this case — well, doesn't this case then turn on whether — well, let me ask you a preliminary question before I ask you this one. Was there any discussion about the instructions on the standard of proof required to show intent to aid and abet as opposed to aiding and abetting? I didn't see any discussion or any claim in your appeal that the court erroneously instructed the jury on the standard of proof for aiding and abetting. I don't believe that was specifically addressed by the court. You basically preserved your error only on the ground that the government did not offer proof of an actor who was aided and abetted, which is the normal standard for aiding and abetting. And your argument, as I understand it, is that the standard of proof for attempt to aid and abet requires those same two elements, the transferring of the information to a known actor who will or is likely to commit a crime with that information. Isn't that your argument? Yes. That's partially our argument. But more of our argument goes to the fact that the government has to prove specific intent. What Mr. Sutcliffe did was to transfer the information, and the government had the responsibility, obligation, to prove that he did it with a specific intent to aid and abet. Now, if there's no act that constitutes false representation of the Social Security numbers, not only that, the government attempt does not require that an act occur. That's what distinguishes it from aid, from regular aiding and abetting, isn't it? Only that one attempts to accomplish aiding and abetting. Right. But our point is what is the evidence that the government presented to show that he had the specific intent to aid and abet? As Judge Kaczynski had pointed out, maybe the jury can infer by doing so that that's what he intended. However, the burden is beyond a reasonable doubt. And I don't think if the government doesn't provide specific evidence of to point that Mr. Sutcliffe transferred information with specific intent for that crime to occur, to aid and abet that specific crime to occur, I don't think they met the burden. It's beyond a reasonable doubt. Your position is what he was really trying to do is to publish it and scare them, and he had no intent that anybody actually use these things and – Right. I don't think anybody can read that he had a specific intent. That's your view. That's one reading of the evidence. Well, why can't the jury on the same facts have concluded that, no, he wanted to scare them, and what's more, he was so angry that he actually wanted as many of them as possible hurt. He wanted to actually induce people to commit identity theft, not just scare them, but actually make sure that a lot of these people whose Social Security numbers information put out there actually get punished. Why couldn't the jury infer that? It may not be the most plausible inference, I don't know, but why is that a plausible inference? Well, again, the burden is beyond a reasonable doubt. I don't think they could – The jury is instructed as to the burden. It knows it must find beyond a reasonable doubt. What we look at is is there sufficient evidence from which a reasonable jury could draw that inference, and I guess what I'm asking you is why can't a reasonable jury, looking at all the evidence, say, yeah, no, he didn't just mean to scare them. He actually meant – he was hoping, he was intending, he was expecting that people would actually use this information. He didn't want to do it because he didn't want to commit this other crime, but he was hoping that thieves out there offshore someplace else would steal the information and, boy, really get back at those people. I mean, is it any different than, let's say, you have a grudge against your neighbor and you know your neighbor's out of town, but, you know, he has somebody sort of collect all the mail and sort of make it look like the house he's lived in, and you instead go and you throw a bunch of newspapers and mail envelopes and make the house look like it's not lived in to attract burglars, and you don't know if anybody's going to come in and burgle them, but you just sort of make it look like this is an away owner. Why isn't that – is this the same situation? Well, I guess it's a similar situation. However, I believe Mr. Sutcliffe's intent had been presented at trial that he – Well, that's what he said, right? That's correct. Well, they don't have to believe him. I mean, what's he going to come and say, you know, yeah, I really wanted them – I wanted not only revenge – I mean, he couldn't deny the revenge thing, you know, so he makes a protective admission because, of course, he did do it. He has to have – if he's going to testify, he's going to have to have a reason. But he's not going to go ahead and say, and what's more, I was really, really hoping that they would – you know, they would – somebody would pick up those numbers and really punish those people. Well, I guess we could argue that, again, that there was no evidence of anybody attempting to do it or – Isn't the breaking point in this evidence that he actually put it online instead of just sending it to – sending them a letter saying, look, I will do this to you? Well, one of the messages – Because the point that you go ahead and commit the threshold act that is defined by the statute, that is distribute without permission that information isn't the most reasonable inference to be drawn, the putting it online as opposed to saying, I'm going to put it online. Well, one of the – In terms of whether that's sufficient to support a jury's inference beyond a reasonable doubt. One of the evidence introduced at trial was the fact that Mr. Sutcliffe, in fact, removed some of the information when he was requested to do so. So that negates his intent that he wanted to aid and abet a false representation because – and he – there was a testimony regarding that if anybody had asked him, then he was willing to remove the information through – there was an attorney that was representing Mr. Sutcliffe at that time in a civil matter, and through his attorney, that was the message that was conveyed, that if anybody wanted to withdraw – had asked Mr. Sutcliffe to withdraw the information, that he would do so. I think we understand your position. On the jurisdictional issue, why doesn't the testimony of Mr. Gilmer and Bishop end your argument? Well, I don't think any of those gentlemen actually tied Mr. Sutcliffe's computer to the information that was transferred. I don't think anybody actually testified that it was Mr. Sutcliffe's computer that was used or where that computer was located at the time the Web pages were uploaded or even whether Mr. Sutcliffe – He didn't do this? It just ended up in the Internet by magic? The evidence presented at trial did not show that Mr. Sutcliffe did it beyond a reasonable doubt. Well, certainly the inferences – He had access, but other people had access, and other people could have altered – Well, I'm not sure I understand your position. The server was in Virginia, right? That's correct, Your Honor. So if he uses the – if he sets up the Web page from California and the Web page is in Virginia, then he's crossing state lines. Are you saying that maybe he went to Virginia and did it – set it up from a computer in Virginia? That's a possibility, Your Honor, and there was no evidence to contradict that. There was no evidence introduced to show that where the computer was actually located. And your position is that they have to show affirmatively a crossing of interstate lines. Why isn't the Internet sort of an instrumentality of interstate commerce so that it doesn't really matter whether a particular – I'm not exactly sure how you cross state lines with these signals anyway. Right, and that's – Some of them go through satellites. Some of them go through – Cable lines. Fiber optic cable, and who knows where they're routed. Right. It seems that the Internet is an instrumentality of interstate commerce, and that's the end of it. Well, if the Ninth Circuit concludes that – That was my question. Why isn't – why isn't – Well, I don't think this circuit has affirmatively held that the Internet – So it's not an instrumentality of interstate commerce until we hold that it is? I believe so. The cart's a little bit before the horse there, isn't it? Well, our argument is that the transfer of information – Maybe a substantive opinion will hold that, huh? That's correct. Well, why shouldn't we hold that? Well, apart from just concluding that the Internet is an instrumentality of interstate commerce, I believe there has to still show that the messages cross state lines and that he did it. I thought – he did it, as far as I understand, but I thought that if you avail yourself of an instrumentality of interstate commerce, it doesn't matter whether or not you cross state lines. If you use a telephone and you call from Pasadena to Long Beach, let's say, just pick two points that are fairly close, that call is not going to be routed to Nevada or Hawaii, right? That's correct. It's going to be routed to India. That's – I mean – Sorry. Yeah, no, I allow that as a possibility, but it doesn't matter whether – the government need not prove that it crossed state lines. You've used the telephone. The telephone is an instrumentality of interstate commerce, and even though that particular signal did not – has not been shown to have crossed state lines, there is a jurisdictional nexus, right? Am I mistaken about that? I'm not sure if that's all correct, Your Honor. I have a book. Thirty years ago I sat on some of these telephone cases, but I thought – and I didn't send one of my clerks to the book to look at this, but I thought we settled the point that you didn't have to prove that the call got transmitted over an interstate line if the line itself was a part of a system which was hooked to the interstate commerce. Do you know the answer to that? No, Your Honor, but I believe – Because if the answer of the telephone cases is that if it's hooked, if the instrument is hooked to the interstate system, that constitutes a nexus, a jurisdictional nexus, then it would be silly to distinguish the – But I believe I came across cases that discuss the calls that had been made over the telephone had to cross state lines. In order to convict – The call itself has to be an interstate call. Well, that – they will – those cases will inform us. Rob, can you get him to stop that racket out there? I'll do my best, Your Honor. Send one of the guards. They'll be very persuasive. With a badge. See, it's telling you. Use an instrumentality of interstate commerce. Shut it down. Well, let's assume that Judge McKay's recollection is correct. I was a law clerk at the time, and that's my recollection, too, 30 years ago. And assuming that's correct, that's still not the Internet. There are differences, of course, between telephone and Internet. One of them is that the telephone, at least at that time, was very highly regulated in a way that the Internet isn't. You remember this was in the days when AT&T still provided telephone service for everybody in the world, just about. And I'm wondering whether, assuming telephones are an instrumentality of interstate commerce, whether we can simply say, okay, the Internet is, too, because it's a bunch of wires, cables, and things that connect. I don't have an answer to that, Your Honor. I suppose the Court can come to that conclusion, that Internet is, in and of itself, an instrumentality of interstate commerce. I think your position, whether you have an opinion or not, your position is that it's not analogous. That's correct, Your Honor. There was some specific evidence in this case, however, about that. And you're just suggesting that he, in fact, put them online and that there were servers that delivered them from more than one place in other states. Wasn't there some evidence of that in the record? That's my recollection from the briefs. I don't think there's any record to show that it was his computer that uploaded the Web pages, any of the Web pages. The evidence, the circumstantial evidence certainly is that his, that what he put out there got uploaded eventually on these other servers. Isn't that right? Well, not necessarily, because other people have had access to the Web pages. Your suggestion is that this record permits an inference that somebody else put those messages out there? Yes. And other people could have altered the Web pages also. And there was no evidence showing where the actual computer that was uploaded, that uploaded the pages, were located. Thank you. Okay. We'll give it to the government. I'm certainly glad we're limiting everybody to 10 minutes. Thank you, Your Honor. May it please the Court. Elena Duarte for the United States. And let me apologize in advance because I am getting over a cold, so. You know, you and half of Los Angeles. Yes, I know. And everybody blames me for giving it to them, but. Not us. We got ours the old-fashioned way. We got it ourselves. But if you just talk into the mic, you'll be heard just fine. Yes, sir. Unless the Court wants to begin. If you could stop the noise. Unless the Court wants to begin with any questions, I can go ahead and address Mr. Park's points. I'm happy to do either. Well, you know, we're interested in these two points. You can take them in whatever order. You've heard what our questions are. Yes, sir. And you can address one or the other or both in whatever order you wish. Yes, sir. Thank you. Starting then with the last point first about the contention that there was not sufficient evidence, perhaps, even if this Court does find that for some reason the state-to-state transfer, or I should say the interstate transfer of the actual physical data that went from Mr. Sutcliffe's computer up to the websites on the Internet, which the evidence showed were hosted at various places. To the extent that the Court even finds that it needs to reach that topic, I wanted to point out a few areas in the record where it is clear from the record that for each of the charged counts, there actually was the physical transfer of data through at least one other state that Mr. Sutcliffe was not in. There's also evidence in the record that Mr. Explain what that means. I am going to do. Well, there was evidence not only in, I think, that Judge Trott brought up, Mr. Bishop, Mr. Gilmer, there were a number of other web host providers that did testify for the government. And they testified that at certain times the website was hosted, certain dates, the website was hosted by their servers, which they then testified were located in certain states. That includes Mr. Gilmer, who was in Virginia, who hosted the website for a period of time. I believe the record showed January 19, 2002, through February 18, 2002. And that's at RT-1107. How do we know he didn't get the data from another computer, also in the Commonwealth of Virginia? Well, in Mr. Gilmer's case, he actually testified. What I think the defense is speaking to that we don't have, and he's right if this is what he's speaking to, is actual logs from the computer itself showing that on this date, this computer moved this file via FTP, file transfer protocol, which the testimony showed was the method used, to this actual physical site. But what we do have is this. We have expert testimony, the testimony of Mr. Siebert, that established that in his expert opinion, and we saw lots of evidence of that introduced in trial, that website was constructed on that computer, which the evidence showed was defendant's computer seized from his house. There were over 15,000 separate web pages, the testimony showed, various the word daily by the testimony of his ex-wife, daily be working on and be putting on that website. The testimony also showed that during the time certain. And that computer would have been in California. The computer was in California until the record showed for the earliest charges in October, yes, in Los Angeles. In New Hampshire? Yes, sir. He moved to New Hampshire by his wife's testimony and the testimony of their former landlady, Ms. Leiter. They moved to New Hampshire on, excuse me, they left for New Hampshire on November 5th of 2001. So the earlier charges, I think there were two of them in October, that computer, that same computer was in Los Angeles. And it was. So we have to infer, or you think it is permissible to infer from that, that he used his computer at one of these or both of these locations, which were away from Virginia, and that the only way that the connection could have been made is by crossing interstate lines. I guess he could have either gone through a landline or supposedly through a satellite, right? Well. 22,000 miles out and then bounced back. Well, it depends on, actually, the testimony showed that, at least as to New Hampshire, it was a cable modem, a transmission AT&T broadband representative from there took the stand. Well, that's right. That gets you to the trunk. That gets you to the big pipe. But how it actually gets transmitted to the country is a bit of a mystery. I mean, people can. And it's also a little bit, it's also a little bit a matter of circumstances. I mean, that's the Equal Conductor website from here to, let's say, San Francisco. If there was a lot of traffic along the way, it might get routed through Nevada. Well, Your Honor, that is absolutely correct. And that is why, as a broader premise, the government urges that this court hold not only, if it finds it necessary to do so, not only that in this particular case, the evidence did establish actual interstate transmission. For instance, Your Honor, in the first count, the one that I just addressed where the computer would have been in Los Angeles, the server was direct NIC, and that's in the record. And their testimony was that their server was located in Louisiana. And the testimony by Special Agent Frank Harrell, as well as by Mr. Gilmer, showed that the method of getting the physical data, the webpages themselves, from the constructing computer, which Mr. Siebert's testimony showed definitively was Mr. Sutcliffe's computer, to the website, no matter where the webpage itself was located, that the method of transport was by FTP, file transfer protocol. Now, the fact that it ended up in Louisiana and it started in Los Angeles, or later on, it started in New Hampshire and it ended up in Virginia, and there were several other States that hosted as well, I by just by looking at that, the interstate transfer is clear. However. Obviously, if the computer where the FTP transfer is initiated is in a different state. Yes, sir. From the web server, obviously, at some point you have to cross at least one state line. Yes, sir. Not only cross, but. Maybe more, but. Yes, sir. But not only cross, but end up in a different state. Right. And as a matter of fact, let me just point to something in the record that I don't think has been mentioned yet. And I'm particularly. We don't have to deal. What you're saying is we don't have to deal with the question of whether or not the Internet as a whole is a instrumentality. I don't think you have to, Your Honor. However, we do think that clearly it is. It has power. Yes, Your Honor. That clearly, and I believe I cited Rapinski just for the general idea that it's a valuable tool in today's commerce, although I know that that was certainly a dicta. And I know it's been suggested in other cases, which I did cite. However, other circuits, which I did try to inform this Court, have actually already pretty much held that it is. And insofar as the child pornography cases, which defense tried to distinguish in their reply brief, if you go back and actually look at those cases, Your Honors, the main reason those cases appear to have hung their hat on indicia of Internet travel, like the European website stamp on one of them, the expert testimony that this piece of child pornography, because of the stamp on it, had to have traveled via the Internet. The reason is, in those cases, those items that the government had to prove moved in interstate commerce under 2252A, the child pornography statute. Those were actually located on disks and on places other than where there was affirmative proof that they had traveled in the Internet. This case is completely different from that. In this case, we actually have affirmative direct evidence, and even if we didn't have all that other evidence, we have the fact that the victims themselves saw these things on the Internet. We don't even need to reach what those courts reached, which is whether or not there was proof that somehow these items... So these would have been victims who were located in California, and they had to access the webpage in Virginia, and that would have been a crossing of interstate. I think that that is technically correct, Your Honor. Unfortunately, and I made my point poorly. That wasn't my point. My point was there is absolutely, as far as I can tell, as far as I've heard, there's no contention here that these threats and these 1028A7 groups of Social Security numbers were not on the Internet. That distinguishes this case from the other. The burden of proof is to show that they were on the Internet. Yes, sir. And there's absolute proof in your view that they were. Yes, sir. As a computer illiterate, pardon me if I try to get you to wade me through so I don't seek expert testimony from my law clerks. I can only try. If I understand it correctly, a webpage is maintained on a server, is that right? It isn't necessarily in the hard equipment, which is my computer that I plunk away at in my office, right? That's absolutely correct, Your Honor. That's a webpage. So if it's a webpage, it has to be on a server somewhere. That is correct, and you don't even need to take my word for it, Your Honor, because that's in the record. That's all I'm asking is just to guide me through the record so I know what I'm doing. Once you move it up, it's up here on the server. So as a result, if you show that it came, that that message, one, is identifiable and linkable to this person because of the details contained in his quarrel and his squabble, that that reached a webpage and that there's a particular server that handled that, which is across state line, you've satisfied standard, non-sophisticated interstate commerce law. Correct, Your Honor. That's your position, and the record will support that. Yes, Your Honor. All right. Absolutely. I hate to complicate things for you, but a webpage could be on your computer. Let me clarify. As I understand the judge's question, I think that what he's saying is correct. The webpage could be on your computer. However, once, as in our case here, once I build the webpage, it's on my computer, and once I send it out onto the Internet on what the record in this case established were other servers, unless my computer is actually functioning as that Internet service, server, which is what I think, Judge Kuczynski, you're asking me, it would, by definition, be someplace else. Like we saw in this case. In this case, there was absolutely no evidence. My webpage is in my office at home. I'm not here. I mean, it doesn't, it does not have to be in a big machine somewhere else. It could just be a little machine right there in your office. It doesn't have to. But it is connected to the Internet, of course. Yes, sir, and I just want to make sure I understand so that no one thinks that I misstated. No one thinks you're misstating anything. Okay. No one thinks you're misstating anything. In the normal case, people buy space on the server, which could be anywhere in the world. Germany, often, you know, sometimes offshore, sometimes in the United States, and a lot of times you don't know where the server is. They're just selling you this space, and you can do whatever you want with it, but it's not necessary. I mean, you could have a server. You could host your own website. That is correct. That is correct. You could host your own website. That's not what happened here, though. That is not what happened here, Your Honor. And in addition to that. But that's the evidence that in this case, there was both a server that had the website, which was open to the world, to the Internet, and that Ms. Sutcliffe's computer had versions of the website. Correct. At various stages. Updating of the website. And this is the primitive like me up to speed. Well, in addition, the website itself, Your Honors, and I was very sensitive to Judge Trott's earlier criticism about the state of the record. I did include copies of the exhibits. They, of course, don't come out as well as they did in electronic form, but you can see that the links And the website itself, you know, where a defendant was boasting that he had 24 free servers up and running at the same time. And the free servers that we were able to find and get up there, which were four of them, there was testimony that those were hosted in San Jose, California. This boast of the free servers was at the time it was in New Hampshire. So even by his own admissions and his own statements made on the website, he was all over the place. Do you want to address the other question we put in? Yes, sir. I'm sorry, this was on the. Aiding and abetting, intent to aid and abet. Yes. He says he was out there, he was there to scare them, he wasn't there to really help anybody. There was no one to help. I mean, he didn't know anybody, he wouldn't work in concert with anybody. And really what he was trying to do was intimidate them and threaten them, not actually help anybody, rob them. Well, I think that the question that was asked, and I know it came up in closing argument, was assuming that that's all correct, that he only meant to intimidate with the Social Security numbers themselves, not to in any way assist with identity theft. What was the purpose of putting them all up there on the web? I mean, unless it was the intent to victimize. It would make the people whose names and Social Security numbers are listed, and now they find out, you know, my gosh, my name and Social Security number, it would make them sleep less soundly at night. Absolutely, and there was actually a lot of testimony. And that's a bad thing, but it is not quite the same as saying, if that's all you intend to do, or you're trying to just make them feel uncomfortable, give them a bad night's sleep, you know, force them to do things to protect themselves, then you've had your revenge. You don't really expect or want or intend for them to actually be robbed by anybody. All you're trying to do is make them feel uncomfortable. Well, in answer to an earlier question, the jury was instructed on intent and knowledge, not specifically in regard to this account, but in regard to all of them. And one of the things that, as Your Honors know, in order to show intent, we have to look into what defendant was thinking. And when we look at these exhibits, which I've included in the excerpt of record, they were not included in the original. I included them in the government's excerpt. They speak to someone who was not only even just putting out Social Security numbers, but who was openly threatening of things to come. When he put up in Exhibit 13, which the Court has, you think seeing that number is bad, it can get much, much worse. He put that in connection with a license plate number. When you clicked, it took one click to the link of you think seeing that number is bad. And it went to another attorney that had been working on the case and a list of his Social Security number, a map to his home address, and then it even had his credit card, a place for credit card numbers and bank accounts, and it said omitted for the time being. Then it said a reference to anyone else who wants to join the team, and I'm paraphrasing, it's in Exhibit 13, we have a special deal. And if you click on that, it said that it addressed a new associate who had just come on the litigation, and it put his bar information on there, public information, and it said we'll be publishing your personal information shortly. As you understand, there's some people ahead of you in line. And again, I'm paraphrasing, but this is all in the record in Exhibit 13. That's just one of the six or seven exhibits that had this open kind of linking and threatening behavior. And that goes above and beyond. I just want to make sure I understand where you're going to. Your view is that there was enough evidence that a jury should infer. I mean, all the things you've said are consistent with just making people uncomfortable. Yes, sir. Making people uncomfortable because the intent was obvious by the defendant to aid and abet the theft of their numbers and to correct the record in the numbers. Let me just give you an example. Let's say you pull out a gun, you point at somebody and pull the trigger. And you know the gun. I'm sorry, Your Honor, pull the trigger? Pull the trigger. Okay. Okay. Don't be scared. It's not loaded. Okay. Okay. You know it's not loaded. I think it would be very, I mean, you know, let's say there's no doubt about it. You know, you can prove clearly that you knew it wasn't loaded. You actually went and unloaded it. Seven bishops sat there and watched you unload it. So there's no doubt that you had no, you know, this was not a mistake or an accident. And you pull the trigger. And obviously you're not going to kill the person unless they have a heart attack or something. But you can say, look, my intent was to scare them. And, you know, nobody could say this was an intent to do more than scare them, to actually shoot them, even though I pointed a gun, it's a real gun, and I pulled the trigger. There are no bullets. So he could very well take the position as, look, what I was trying to do is I was not trying to get them robbed. I was only trying to make them feel really, really uncomfortable by doing this harassment. I'm not saying pointing a gun and pulling the trigger shouldn't be a crime as well. I'm just saying it's a different crime. If I could borrow the Court's analogy for just a minute. I agree with the Court. That's completely different. But it's also distinguished from this set of facts because it would be one thing if I either wrote you a letter or even if I put up on the website, you know, I'm not very happy with the argument today. And so I think that everybody's Social Security number should be up there. That's pointing an unloaded gun. When I actually put 8,000 Social Security numbers, dates of birth, together with threatening language up there, and contrary to something that I'm sure unintentionally Mr. Park suggested from the record, which was that defendant removed them when asked to do so. I don't think there's any evidence of that that I remember. And that I remember reading. I tried the case as well in the record. As a matter of fact, the evidence was that, and the exhibits are included in the GER, that he offered on the website to remove them. But then he would asterisk it with a cute little comment like, you must first show you no longer work for the company. There was another comment that said, you must first provide us all identification data so we can make sure you're who you say you are. Then maybe we'll remove the offending webpage. So I submit back to the analogy that this was actually a loaded gun. And he didn't just threaten to pull the trigger. He pulled it. He put all the stuff up on the Internet, and then he let it sit there for months. There's no evidence that any of these Social Security numbers were actually misused by anybody. Your Honor, we did not rely on that at trial, no. There was some limited evidence at trial by Ms. Greenwood, who was the one who originally took all the complaints, that employees were going crazy and they were actually reporting identity theft. However, and I want to get that out because I want to represent the record accurately. However, yeah, I try to do that. However, we did not rely on that at trial, and it was and continues to be our position that we did not need to show that. And I did not argue that for that precise reason. However, that said, Your Honor, there was some limited evidence of that at trial. Scalia. Fair enough. I take it they're actually the only law we were able to find as a New York State case on what the burden of proof is on attempt to aid and abet. But apparently, in aiding and abetting, you have to identify somebody who a specific person who is committing the crime. But your position on the standard of proof for attempt to do so is that you don't have to show any specific person that you were shopping the field. Is that your view? Yes, Your Honor, but no argument so far as we know. Apparently, they've not raised the issue that the jury was erroneously instructed in this case. Is that correct? It is correct that that issue was not raised. I think the Court's other point is correct. But let me just correct, make sure that I don't misspeak by saying that in this particular case, although the Court did ask about attempted aiding and abetting, in this particular case it's our position that the intent to aid and abet was a separate element, one of four or five, of the 1020 20, excuse me, of the 1028A7 count. That was intent, not attempt, just so I make it clear. And that it wasn't advanced and it's not intended and it's not in the statute as any sort of theory of liability, which I think is what defense is arguing and what the Court has said correctly need be proven when aiding and abetting is a theory of liability for a principal offense. That was not the situation here. And even a short look at the simple language of the statute, it's if the defendant has the intent to commit, the intent to aid and abet the commission of, or the intent to, or I believe it's the use in connection with, another felony. So there's three different options. We chose the intent to aid and abet. It could have been the intent to commit. And certainly no commission would have been required under that standard. It could have been the intent to use in connection with. Scalia. But you're not arguing that proof in this case, that he attempted to commit it? No. Only that he intended it and that that is evidenced by the record. And he intended to aid and abet it? Aid and abet it, Your Honor. Aid and abet it. And we argue that that's in the record. Thank you. Thank you very much. Thank you. If I may just briefly address the court. We'll give you a minute. Okay. Ms. Duarte alluded to Mr. Siebert's testimony. And in the cross by Mr. Sutcliffe, Mr. Siebert was asked this question. Of these pages you talked about that were created on Evil GX, that were created on this computer, can you tell with 100% accuracy whether all of these pages were created by the defendant? Answer, no, I cannot. Another question put to him by Mr. Sutcliffe was, can you tell through your analysis where physically the defendant or anybody was at when that page or any of those pages was put up on the website? The answer, no, I cannot tell you where the computer was physically located when the web pages were created and posted to the Internet. So even Mr. Siebert. He might have flown with his computer to Virginia. So it's not that he could just be in Virginia and use some computer. He had to use this particular computer, hook it up to the Internet in Virginia. That's correct. And there was. Uploading the web pages. Right. There was no evidence to show that even that computer was the computer that was retrieved at a later point from Mr. Sutcliffe. Mr. Sutcliffe's house. I thought the government represented that versions of the web page where a backup version of the web page were found on Mr. Sutcliffe's computer. That's correct, but that doesn't. He would create the version on his computer and then FTP up to the server. Well, Mr. Siebert's testimony shows that he's not sure who created. What did the wife say about where the computer was? It was at his home in California and it was at his home in New Hampshire when they moved. Thanks. One more point, Your Honor, and that is Ms. Duarte pointed to the fact about the viewers being in California. But Ms. Duarte also pointed out that there were numerous servers and there was no evidence at trial to show how the web pages traveled to the viewers, how the viewers actually got to view the web pages. And as Ms. Duarte aptly pointed out, there were many servers. We don't know how many servers there were and where they were located. We heard from a few individuals where at a certain point in time the servers were located. However, we had no evidence. As a practical matter, does it really make any difference? I mean, this seems to be the kind of accidental fact that shouldn't make any difference as to whether there is or isn't federal jurisdiction. It sounds to me like what you're supporting is an instrumentality theory, that the Internet is an instrumentality and we shouldn't worry too much about whether a particular transmission happens to be routed across state lines or not. Well, if this Court rules on that point, then it will be the law of the circuit. Okay, thank you very much. Case, Josiah, you may stand for a minute.
judges: McKay , Kozinski, Trott.